IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONDRA GRAY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:14-cv-3308-P-BN |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Dondra Gray seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). For the reasons stated herein, the hearing decision should be reversed.

**Background**

Plaintiff alleges that she is disabled as a result of high blood pressure and bipolar disorder. *See* Administrative Record [Dkt. No. 13 ("Tr.")] at 18, 172. After her application for disability insurance benefits was denied initially and on reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ"). That hearing was held on April 19, 2013. *See id.* at 39-81. At the time of the hearing, Plaintiff was 42 years old. *See id.* at 44. She has a high school equivalency diploma and past work experience as a court clerk, accounting clerk, file clerk, cleaner, and leasing agent. *See id.* at 31, 44. Plaintiff has not engaged in substantial gainful activity since June 13, 2011. *See id.* at 20.

The ALJ found that Plaintiff was not disabled and therefore not entitled to disability benefits. Although the medical evidence established that Plaintiff suffered from obesity, hypertension, partial thickness tear of the supraspinatus tendon of the left shoulder, bipolar disorder, and anxiety, the ALJ concluded that the severity of those impairments did not meet or equal any impairment listed in the social security regulations. *See id.* at 21. The ALJ further determined that Plaintiff had the residual functional capacity to perform her past relevant work as a cleaner. *See id.* at 31-32. Additionally, relying on a vocational expert's testimony, the ALJ found that Plaintiff was capable of working as a marker, plastic products inspector/hand packager, and bakery worker on a conveyor line – jobs that exist in significant numbers in the national economy. *See id.* at 49.

Plaintiff appealed that decision to the Appeals Council. The Council affirmed.

Plaintiff then filed this action in federal district court. In a single ground for relief, Plaintiff contends that the assessment of her residual functional capacity is not supported by substantial evidence and results from reversible legal error.

The undersigned concludes that the hearing decision should be reversed and this case remanded to the Commissioner of Social Security for further proceedings consistent with these findings and conclusions.

## Legal Standards

Judicial review in social security cases is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether Commissioner applied the proper legal standards to evaluate the

2

evidence. *See* 42 U.S.C. § 405(g); *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Copeland*, 771 F.3d at 923. The Commissioner, rather than the courts, must resolve conflicts in the evidence, including weighing conflicting testimony and determining witnesses' credibility, and the Court does not try the issues *de novo*. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). This Court may not reweigh the evidence or substitute its judgment for the Commissioner's but must scrutinize the entire record to ascertain whether substantial evidence supports the hearing decision. *See Copeland*, 771 F.3d at 923; *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988). The Court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland*, 771 F.3d at 923.

"In order to qualify for disability insurance benefits or [supplemental security income], a claimant must suffer from a disability." *Id.* (citing 42 U.S.C. § 423(d)(1)(A)). A disabled worker is entitled to monthly social security benefits if certain conditions are met. *See* 42 U.S.C. § 423(a). The Act defines "disability" as the inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or last for a continued period of 12 months. *See id.* § 423(d)(1)(A); *see also Copeland*, 771 F.3d at 923; *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). The Commissioner has promulgated a five-

3

step sequential evaluation process that must be followed in making a disability determination:

1. The hearing officer must ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.

2. The hearing officer must determine whether the claimed impairment is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities. This determination must be made solely on the basis of the medical evidence.

3. The hearing officer must decide if the impairment meets or equals in severity certain impairments described in Appendix 1 of the regulations. The hearing officer must make this determination using only medical evidence.

4. If the claimant has a "severe impairment" covered by the regulations, the hearing officer must determine whether the claimant can perform his or her past work despite any limitations.

5. If the claimant does not have the residual functional capacity to perform past work, the hearing officer must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and residual functional capacity.

*See* 20 C.F.R. § 404.1520(b)-(f); *Copeland*, 771 F.3d at 923 ("The Commissioner typically uses a sequential five-step process to determine whether a claimant is disabled within the meaning of the Social Security Act. The analysis is: First, the claimant must not be presently working. Second, a claimant must establish that he has an impairment or combination of impairments which significantly limit [her] physical or mental ability to do basic work activities. Third, to secure a finding of disability without consideration of age, education, and work experience, a claimant must

4

establish that his impairment meets or equals an impairment in the appendix to the regulations. Fourth, a claimant must establish that his impairment prevents him from doing past relevant work. Finally, the burden shifts to the Secretary to establish that the claimant can perform the relevant work. If the Secretary meets this burden, the claimant must then prove that he cannot in fact perform the work suggested." (internal quotation marks omitted)); *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007) ("In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.").

The claimant bears the initial burden of establishing a disability through the first four steps of the analysis; on the fifth, the burden shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant can perform. *See Copeland*, 771 F.3d at 923; *Audler*, 501 F.3d at 448. A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Copeland*, 771 F.3d at 923; *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

In reviewing the propriety of a decision that a claimant is not disabled, the Court's function is to ascertain whether the record as a whole contains substantial evidence to support the Commissioner's final decision. The Court weighs four elements

5

to determine whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *See Martinez*, 64 F.3d at 174.

The ALJ has a duty to fully and fairly develop the facts relating to a claim for disability benefits. *See Ripley*, 67 F.3d at 557. If the ALJ does not satisfy this duty, the resulting decision is not substantially justified. *See id.*

However, the Court does not hold the ALJ to procedural perfection and will reverse the ALJ's decision as not supported by substantial evidence where the claimant shows that the ALJ failed to fulfill the duty to adequately develop the record only if that failure prejudiced Plaintiff, *see Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012) – that is, only if Plaintiff's substantial rights have been affected, *see Audler*, 501 F.3d at 448.

"Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Ripley*, 67 F.3d at 557 n.22. Put another way, Plaintiff "must show that he could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728-29 (5th Cir. 1996).

## Analysis

Plaintiff contends that the ALJ's determination of her residual functional capacity ("RFC") is not supported by substantial evidence because the ALJ rejected the only medical opinion describing the effects of Plaintiff's mental impairments.

The RFC is an assessment, based on all the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite her impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.954(a). The RFC refers to the most that a claimant is able to do despite her physical and mental limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.954(a). The ALJ considers the RFC, along with the claimant's age, education, and work experience, to make a determination as to whether the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "Generally, an ALJ should request a medical source statement that describes the types of work a claimant can still perform." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *see also Johnson v. Astrue*, No. 3:12-cv-4175-BK, 2013 WL 3297594, at *4 (N.D. Tex. July 1, 2013). The absence of such a statement is only reversible error, however, if the ALJ's decision is not supported by substantial evidence. *See Ripley*, 67 F.3d at 557.

In *Ripley*, the ALJ ruled that the claimant could perform sedentary work even though there was no medical evidence or testimony supporting that conclusion. *See id.* The Court of Appeals noted that the claimant's record contained a vast amount of evidence establishing that he had a back problem but did not clearly establish the effect that condition had on his ability to work. *See id.* The Fifth Circuit therefore remanded with instructions for the ALJ to obtain a report from a treating physician

7

regarding the effects of the claimant's back condition on his ability to work. *See id.* at 557-58. The Court of Appeals rejected the Commissioner's argument that the medical evidence substantially supported the ALJ's conclusion because the court was unable to determine the effects of the claimant's conditions, "no matter how 'small,'" on his ability to work, absent a report from a qualified medical expert. *See id.* at 558 n.27.

In this case, the ALJ found that Plaintiff had the RFC "to perform light work with the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, as well as the ability to sit for 6 hours and to stand and/or walk for 6 hours in an 8-hour workday. She can occasionally climb ramps or stairs but is unable to climb ladders, ropes, or scaffolds. She can frequently kneel or crouch, occasionally stoop, and never balance or crawl. She should avoid even moderate exposure to extremes of heat and/or humidity. She should avoid hazards including unprotected heights, moving mechanical parts, open flames, and driving as a job duty. Mentally, the claimant retains the ability to perform 1-step and 2-step instructions requiring occasional contact with coworkers, supervisors, or the public." Tr. at 22. The ALJ observed that there were no opinions regarding Plaintiff's ability to perform work-related mental tasks from any reviewing source, and he gave little weight to the opinions of a psychiatrist and nurse practitioner. *See id.* at 27-31.

On February 7, 2013, Barry Fenton, M.D., completed a Physician's Certification in which he opined that Plaintiff had a mental impairment that prevented her from engaging in substantial gainful activity. He diagnosed Plaintiff with bipolar disorder with co-morbid depressive symptoms and a global assessment function ("GAF") score

of 55. Dr. Fenton stated that Plaintiff's bipolar disorder affected her mood swings, which ranged from extreme irritability to profound depression and made work and personal communications difficult. He further stated that Plaintiff's co-morbid depressive symptoms at times limit her ability to function in social settings and episodes of profound depression and irritability limit her social interaction and interpersonal communications. *See id.* at 413.

On April 15, 2013, treating nurse practitioner Linda Betts completed a Medical Source Statement in which she opined that Plaintiff had limitations that seriously interfere with her ability to carry out simple or detailed instructions, maintain attention and concentration for two hours, sustain ordinary routines without special supervision, work in coordination with or proximity to others, interact appropriately with the general public, request assistance, accept instructions or respond appropriately to criticism from supervisors, get along with coworkers, respond appropriately to changes in a routine work setting, or cope with normal work stresses without exacerbating psychologically based symptoms. Additionally, Ms. Betts opined that Plaintiff had an extreme loss in the ability to complete a normal work week without interruptions from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. *See id.* at 499-500.

The ALJ gave Dr. Fenton's or, for that matter, Ms. Betts's opinions little weight and did not include any of their limitations in the RFC. Instead, the ALJ discussed the

9

following evidence concerning treatment for Plaintiff's mental condition and the report of an examining psychiatrist.

The ALJ observed that Plaintiff underwent an initial evaluation for psychiatric services at Timberlawn on April 12, 2009, which was more than two years before her alleged onset date. Plaintiff complained that her current psychiatric medications of Effexor and Klonopin did not provide adequate symptom relief. She identified stressors in her life including a father in a nursing home, a 20-year old and three step-children living in the home, and a 24-year-old son in jail and soon to go to trial. She was diagnosed with moderate, recurrent depressive disorder and a GAF of 40. *See id.* at 299-303.

When Plaintiff returned to Timberlawn on June 3, 2009, her mental status exam was fully normal. She reported that her son pleaded guilty and could receive probation, which made her feel better. She requested less expensive medication, and her medications were reduced to only Effexor and Klonopin. *See id.* at 292.

When Plaintiff returned to Timberlawn on September 1, 2009, she exhibited slightly depressed mood but otherwise her mental status examination was fully normal, including normal memory and concentration. She reported that her son had received a 25-year prison sentence and that she liked her job but felt stress over having her son currently jailed in the same building in which she worked. She was again diagnosed with major depressive disorder and with a GAF of 60. Her medications were changed to Zoloft, Wellbutrin, and Klonopin. *See id.* at 296-97.

Plaintiff was treated by her primary care physician Dr. Ashwani D. Srivastava three times. On February 17, 2010, Dr. Srivastava prescribed Xanax for anxiety. On November 5, 2010, he authorized additional Xanax due to Plaintiff's reports of increased stress at home. On June 8, 2011, Plaintiff complained of depression and additional stress due to caring for both of her parents in her home. Dr. Srivastava prescribed both Xanax and Cymbalta. *See id.* at 341, 337, 333.

After the alleged onset date, Plaintiff sought specialized outpatient mental health services at Metrocare on July 5, 2011. Her chief complaint was that she needed help with her mental stability. According to a psychiatric assessment, Plaintiff reported a history of treatment for bi-polar depression in 2009 when under tremendous stress and a recent onset of depression brought on by her caring for her mother who had suffered two strokes and her father who was in a nursing home. She also reported that she had quit her job as supervisor of the criminal courts. Plaintiff exhibited depressed mood and euthymic affect in an otherwise normal mental status examination. The psychiatrist, Juanita Kirby, M.D., commented that Plaintiff seems to be bipolar and has been able to stay under control most of the time. Dr. Kirby prescribed Ambien and Depakote and rated Plaintiff's Brief Bipolar Disorder Symptom ("BDDS") at 20. *See id.* at 365-66.

The ALJ noted that, in the history section, no reason was given for Plaintiff's quitting her job but that, later that same day, she informed a case manager that she wanted to get her mother sufficiently improved so that she could return to work. According to the ALJ, "[t]his statement indicates that the claimant stopped working

11

to care for the mother versus her having lost the ability to perform her past job due to her own medical considerations." *Id.* at 29; *see also id.* at 365, 367.

Plaintiff returned to Metrocare on August 8, 2011 for pharmacological management of bipolar disorder. She was in pain and irritable from recent gall bladder surgery. She also had a blunted affect but otherwise normal mental status examination. She reported that Depakote provided some symptom relief but that she continued to experience panic attacks, and her Depakote dosage was increased. She was rated with a BDDS of 18 and a GAF of 45. *See id.* at 444-49.

Plaintiff sought treatment at Live Oak Counseling Center on September 11, 2011. She complained of bipolar disorder and depression and described her symptoms as not sleeping, increased irritability, depressed mood, low energy, and low motivation. She explained that she stopped working to care for her mother and described herself as devastated by her son's imprisonment. She listed her current medications as Ambien and Xanax and her past psychiatric medications as Depakote, which she said was not effective, and Lexapro, Zoloft, and Cynmbalta. She exhibited mild psychomotor retardation, intact memory, depressed mood and affect, and intact concentration. Deborah Croissant, RN, NP, continued Ambien, changed Xanax to Clonazepam, and was prescribed both Depakote and Seroquel. *See id.* at 396, 398.

Ms. Croissant with Live Oak Counseling continued to manage Plaintiff's medication for the next several months. On September 22, 2011, she discontinued Depakote and increased the Seroquel dosage after Plaintiff complained of some agitation and irritability and she continued to find noise or talking bothersome. On

12

October 20, 2011, she adjusted Plaintiff's medication doses after noting that Plaintiff was sleeping better and her mood was better and more stable. *See id.* at 401. On December 13, 2011, she prescribed a transition from Seroquel to Pristiq. She noted a complete absence of manic symptoms other than irritability since starting treatment at Live Oak. Ms. Croissant also diagnosed Plaintiff with major depression, which was compounded by three major life stressors: her son was in prison, she had to quit her career, and she was the care-giver for her mother, who had physical movement disabilities. *See id.* at 395. On January 26, 2012, she changed Plaintiff's medication from Pristiq to Trileptal and noted that Plaintiff continued to have racing thoughts, irritability, and depression but that she received some help to care for her mother from family members. *See id.* at 497.

At the Commissioner's request, Plaintiff was examined by Lawrence Sloan, Ph.D., on February 2, 2012. Plaintiff reported problems with concentration, anxiety attacks, and racing thoughts. She explained that she resigned from her job in June 2011 because she could not meet work-related deadlines. She reported that her current provider had diagnosed her with bipolar disorder and that her current medications were Fluoxetine, Oxycarbazepine, Clonazepam, and Zolpidem. She endorsed symptoms including racing thoughts, ruminating about her son, avolition, crying spells, fatigue, poor concentration, rapid mood changes, hopelessness, and guilt. She denied instances of expansive mood, impulsive behaviors, or high energy. She indicated that she felt anxious around many people. Remarkable findings in the otherwise fully normal mental status examination included depressed mood with calm, cooperative, dysphoric,

and at one time tearful affect. Plaintiff's memory and concentration remained intact as demonstrated by the ability to recall two of three items after a five-minute delay and the ability to spell "world" backward. Dr. Sloan assessed Plaintiff as having major depressive disorder with a GAF of 50. *See id.* at 404-08.

Ms. Croissant with Live Oak Counseling continued to manage Plaintiff's medication. On February 23, 2012, she increased Plaintiff's doses of Trileptal and Prozac. *See id.* at 497. In April 2012, Plaintiff attempted to stop taking Prozac because she started taking Imitrex for migraines. By the end of the month, she resumed taking Prozac. *See id.* at 496. On August 16, 2012, Ms. Croissant noted that Plaintiff received better symptom relief for major depressive disorder when taking the increased dose of Prozac, and she characterized Plaintiff's mood as "almost euthymic." *See id.*

Plaintiff's initial visit with Linda Betts at Live Oak Counseling was on November 8, 2012. Plaintiff reported mood liability, racing thoughts, increased irritability, and periods of extreme energy such as cleaning the house at 3:00 in the morning. Plaintiff declined an offer to increase the dose of Trileptal due to financial issues. *See id.* On February 7, 2013, Plaintiff complained of continuing problems of racing thoughts, lack of concentration, irritability, lack of sleep, cleaning at night and making lists. Ms. Betts began to transition Plaintiff from Trileptal to Lithium. *See id.* On March 14, 2013, Plaintiff reported that she experienced "much improvement" from Lithium, with fewer racing thoughts, less irritability, and less need to clean at night. Plaintiff's prescription for Clonazepam was changed back to Xanax. *See id.* On April 15, 2013, Plaintiff reported that she was less irritable and her moods were less erratic

but that she still occasionally had racing thoughts. She complained of new onset of hand tremors with Lithium but agreed to remain on the medication. *See id.*

According to the ALJ, "[t]his evidence demonstrates that the claimant requires ongoing mental health care and appropriate psychotropic medications to control symptoms of a mood disorder, characterized as depression or bipolar disorder, and anxiety. She continues to experience mild to moderate symptoms, however, when taking her medications as prescribed. It is reasonable to conclude that the claimant's residual symptoms cause at least some limitation in her ability to concentrate and remember. There is no objective evidence, however, that the residual symptoms are so severe that they seriously interfere with her ability to function independently, appropriately, effectively, and on a sustained basis. This supports a conclusion that the claimant can sustain competitive work while carrying out at least 1-step and 2-step instructions. Her subjective reports regarding a tendency to isolate warrant the further restriction of occasional contact with coworkers, supervisors, and the public." The ALJ then concluded that the evidence, considered as a whole, supported the determination that Plaintiff is able to perform light work with the additional postural, environmental, and mental limitations included in the RFC. *See id.* at 31. In reaching this conclusion, the ALJ gave little weight to the opinions of the psychiatrist and nurse practitioner who opined about the effects of Plaintiff's mental impairments on the ability to perform work-related functions.

The Fifth Circuit has "held that an ALJ may not – without opinions from medical experts – derive the applicant's residual functional capacity based solely on the

15

evidence of his or her claimed medical conditions," and "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) (citing *Ripley*, 67 F.3d at 557)); *see also Moreno v. Astrue*, No. 5:09-cv-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010), *rec. adopted,* 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010) (explaining that without expert medical interpretation, "evidence describing the claimant's medical conditions is insufficient to support an RFC determination").

In this case, the ALJ impermissibly relied on her own lay opinion, derived from her interpretation of the medical evidence and not that of a medical expert, to determine the effects of Plaintiff's mental impairments on Plaintiff's ability to work. *See Frank v. Barnhart,* 326 F.3d 618, 622 (5th Cir. 2003) (ALJs "must be careful not to succumb to the temptation to play doctor" or make their own independent medical assessments.) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). The ALJ cited no expert who opined Plaintiff was capable of performing 1-step and 2-step instructions and no expert who opined Plaintiff could occasionally have contact with coworkers, supervisors, and the public. Nor did (even assuming the Commissioner is correct that a nurse practitioner does not qualify as an acceptable medical source),the ALJ cite to any medical expert opinion that contradicts that of Dr. Fenton, even though the ALJ did cite to the consulting examiner's report in which Dr. Sloan concluded that Plaintiff's prognosis was "guarded given the chronic nature of symptoms in spite of treatment," which is not inconsistent with Dr. Fenton's.

16

An ALJ may weigh competing medical opinions, *see Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012), but may not substitute her lay opinion for the uncontroverted medical opinion of the only physician who opined concerning the effects of Plaintiff's mental impairments, *see Williams*, 355 F. App'x at 832; *see also Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) ("The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.") (citations omitted). Because the ALJ rejected the only medical expert evidence concerning the effects of Plaintiff's mental impairments, which the ALJ found to be severe, the undersigned concludes that the ALJ's RFC determination is not supported by substantial evidence.

Nevertheless, because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her mental RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). To establish prejudice, Plaintiff must show that the ALJ's failure to obtain a medical opinion assessing the effects her mental impairments had on her mental RFC casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec.*, 537 F. Supp. 2d 828, 827 (N.D. Tex. 2009) ("Procedural errors in the disability determination

17

process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's hypothetical questions to the vocational expert ("VE") incorporated the ability to have occasional contact with coworkers, supervisors, or the public and to perform 1-step and 2-step instructions. In response to the questions, the VE concluded that Plaintiff could perform past relevant work as a cleaner and work as a marker, inspector and hand packager of plastic products, or conveyor line bakery worker. *See* Tr. at 77-78. In her unfavorable decision, the ALJ incorporated those mental limitations into the RFC, *see id.* at 22, and found that Plaintiff was capable of performing those jobs, *see id.* at 31, 33.

Because the ALJ's unfavorable decision was based on the VE's answers to defective hypothetical questions, substantial evidence does not support the ALJ's finding that Plaintiff was not disabled. And Plaintiff's substantial rights have been affected because the ALJ's decision may have been different had the ALJ's hypothetical questions incorporated the mental limitations in the rejected medical opinion.

## Recommendation

The hearing decision should be reversed and this case remanded to the Commissioner of Social Security for further proceedings consistent with these findings and conclusions.[1]

---

[1] By recommending remand for further administrative proceedings, the undersigned does not suggest that Plaintiff is or should be found disabled.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 15, 2015

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE

19